Filed 5/5/26  In re M.S. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | B344422 (Los Angeles County Super. Ct. No. VJ46698) |
| THE PEOPLE, Plaintiff and Respondent, v. M.S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Benjamin R. Campos, Commissioner.  Reversed and remanded with directions.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Deepti Vaadyala and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

M.S. appeals from a juvenile court order transferring him from the juvenile court to a court of criminal jurisdiction pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).[1]  In 2021 the Los Angeles County District Attorney filed a juvenile wardship petition under section 602, subdivision (a), charging M.S. with first degree murder based on his shooting of another minor (Brandon F.) at a residential party on the night of May 31 that year.  In February 2022 the juvenile court granted the People's motion to transfer.

In granting the transfer motion, the juvenile court considered the five criteria set forth in section 707 that the court was required to consider in deciding whether a minor should be transferred to a court of criminal jurisdiction, including (1) the minor's degree of criminal sophistication; (2) whether the minor "can be rehabilitated" prior to expiration of the juvenile court's jurisdiction; (3) the minor's prior delinquent history; (4) whether prior attempts to rehabilitate the minor have been successful; and (5) the circumstances and gravity of the alleged offense. (§ 707, subd. (a)(3)(A)-(E).)  On appeal, M.S. contends substantial evidence does not support the court's transfer decision, and the

_____

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

court considered improper factors in evaluating the second criterion.

We agree the juvenile court erred with respect to the second criterion in relying on recidivism data from the Division of Juvenile Justice (DJJ) system for juvenile offenders (which was closed by statute at the end of June 2023) and an expert opinion relying on that data to predict whether M.S. could be rehabilitated prior to expiration of the juvenile court's jurisdiction after receiving rehabilitative services in the Secure Youth Treatment Facility (SYTF) system. The SYTF facility replaced the DJJ as part of "[j]uvenile justice realignment" enacted by Senate Bill No. 823 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 337, § 1(e)) (Senate Bill 823). The court's reliance on data from the failed DJJ system to predict outcomes at the SYTF facility was contrary to the Legislature's stated intent in establishing the SYTF system to provide more robust rehabilitative services for youth offenders. Further, substantial evidence did not support the court's finding that the SYTF would provide enhanced mental health and substance abuse treatment and other services.

We therefore reverse the juvenile court's order transferring M.S. to a court of criminal jurisdiction and remand for the juvenile court to reconsider the second criterion and determine, in light of all five criteria, whether the People have met their overarching statutory burden of demonstrating by clear and convincing evidence that M.S. is not amenable to rehabilitation under section 707, subdivision (a)(3).

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Alleged Offense*

On the evening of May 31, 2021 M.S., who was then 17 years old, attended the 18th birthday party of his ex-girlfriend, L.R., at her residence in the City of Maywood. L.R.'s aunt, who attended the party, saw M.S. and asked him to leave because she was concerned about his prior violence and drug use, and she was afraid that something bad would happen if he stayed. M.S. left the party but later returned.

Brandon was at the party that night. In 2019 M.S. and Brandon had a confrontation in which Brandon accused M.S. of robbing him.[2] After M.S. returned to the party, he approached Brandon and called him a "'fucking snitch.'" Brandon appeared scared after this encounter, and he left the party with two friends. One of Brandon's friends later reported that he saw M.S. holding onto something in his waistband after M.S. returned to the party.

After Brandon left, the aunt observed a "commotion" at the front of the house. The aunt saw her sister and another individual holding M.S. down. M.S. was able to free himself and started running down the street in the direction Brandon had gone. The aunt heard someone say that M.S. was holding a gun. Surveillance video from nearby residences showed an individual matching M.S.'s description walking down the street in the area where the party took place, and several voices can be heard shouting M.S.'s name at least four times. Then three gunshots

---

[2]    M.S. was charged with robbery and assault in connection with that incident, but the charges were later dismissed.

can be heard, and the same individual can be seen running back the way he had come. L.R.'s aunt and another guest at the party believed M.S. was under the influence that night.

Los Angeles County Sheriff's deputies responded to a radio call reporting a shooting at the Maywood residence that had occurred at about 11:00 p.m. on May 31. When the deputies arrived, they found Brandon lying on the ground suffering from gunshot wounds. He died at the scene.

At around 3:00 a.m. the following morning, sheriff's deputies investigating the murder observed M.S. live streaming on his social media account while stating, "'I just shot that fool, he should be cold by now . . . . I shot that nigga because he tried to snatch my chain. Fuck that nigga.'" M.S. continued, "'I need to kill again . . . get high again. I put that nigga in the ground.'" The deputies were able to determine M.S.'s location from the landmarks in the background of the video, and they arrested him.

Investigators obtained a search warrant for M.S.'s social media accounts. In February 2021 M.S. messaged another user stating, "'I need a glock . . . not a revolver,'" and the user responded, "'U still gone kill the nigga with either.'" M.S. responded, "'Nah ima go to war.'" Two days before the shooting, when asked whether he would attend L.R.'s party, M.S. stated, "'Ima end up smoking some1.'" When asked who, M.S. replied, "'Nah . . . I know . . . what Ima do.'" In the morning after the shooting, M.S. posted a photo of a handgun captioned "'Fuck a snitch.'" M.S. also posted on his social media account after the shooting, "'I just shot that fucking snitch.'"

5

B.    *The Petition and Motion To Transfer*

On June 2, 2021 the Los Angeles County District Attorney's office filed a section 602 petition charging M.S. with one count of murder (Pen. Code, § 187, subd. (a)).  M.S. was 17 years and 11 months old at the time of the alleged offense.  On February 24, 2022 the People filed a motion to transfer M.S. from the juvenile court to a court of criminal jurisdiction under section 707, subdivision (a)(1).  The People attached a probation report and detention observation reports from M.S.'s detention in juvenile hall following his arrest.  Defense counsel submitted exhibits in opposition to the transfer motion.

C.    *The Evidence at the Transfer Hearing*

The juvenile court held a 10-day hearing starting on December 3, 2024.  Documents submitted by the parties and the testimony of witnesses provided the following background information.

1.    *M.S.'s childhood, mental health, and substance abuse*

M.S. was primarily raised by his father, after his mother abandoned the family when M.S. was five years old.  When M.S. was around seven years old, he was placed on a 72-hour psychiatric hold after punching a peer.  He was diagnosed with bipolar disorder, mood disorder, and attention deficit hyperactivity disorder (ADHD) and was prescribed antipsychotic and ADHD medications.  M.S. remained on these medications until he was about 13 years old, at which point his father allowed him to stop taking the medications because M.S. did not like how the medications made him feel.  While he was in detention, M.S. was diagnosed with posttraumatic stress disorder (PTSD).

6

M.S. began drinking alcohol and using controlled or illegal substances when he was 14 or 15 years old. He used Xanax and marijuana daily, consumed alcohol regularly, and used nitrous oxide and LSD weekly. At some point his friends began withholding Xanax from him because it caused him to fall asleep or act erratically. M.S. reported that he attempted to fight his friends to obtain more Xanax and acknowledged that he was "'blacking out'" while under its influence. M.S. said he consumed a "'whole bunch'" of Xanax and "'microdosed'" on the morning of Brandon's murder.

2. *M.S.'s previous history of delinquency*

In February 2019, when M.S. was 15 years old, he committed misdemeanor vandalism and possession of spray paint (Pen. Code, §§ 594.1, subd. (e)(1), 594.2, subd. (a)) and was ordered to complete 10 hours of community service as part of a diversion program. The following month M.S. was arrested for resisting and obstructing an officer (*id*., §§ 69, subd. (a), 148, subd. (a)(1)), and he was again ordered to complete community service and participate in family therapy. In April M.S. was arrested for robbery and the assault of Brandon (*id*., §§ 211, 245, subd. (a)(4)), but the charges were later dismissed. In August 2019 M.S., then 16, was arrested for resisting and obstructing an officer and battery (*id*., §§ 148, subd. (a)(1), 242). He was declared a ward of the court and placed on informal probation at home. M.S. was next arrested in June 2020, when he was 17, for misdemeanor possession of aerosol paint with intent to deface property. The juvenile court again released him to his father on probation at home.

3. *M.S.'s post-arrest detention at Barry J. Nidorf Juvenile Hall*

M.S. was housed at Barry J. Nidorf Juvenile Hall from the time of his June 2021 arrest until July 2023. He initially received positive behavioral notes from detention officers and attended school consistently. On January 8, 2022, however, M.S. and another youth engaged in "horseplay," and M.S. kicked, then slapped the youth across his face. A detention officer spoke with the other youth about signing a document against M.S., and M.S. tried to intimidate the youth by yelling, "'Don't sign your death certificate.'" Between April 2022 and March 2023, M.S. continued to get into fights with other youths, including on one occasion displaying gang signs. Another time, after an officer performed a routine search of M.S. and his room and told M.S. a strip search had been authorized, M.S. attempted to punch and kick the detention officers. The officers then recovered a sharp metal tip from him. On one occasion M.S. kicked in and broke a staff office door; on another, he threw a trash can at a window, attempting to break it.

Despite this behavior, M.S. started participating in therapy through the Los Angeles County Department of Mental Health (DMH) twice a week; a peer mentorship program called the Anti-Recidivism Coalition (ARC) once a week; weekly therapy with Homeboy Industries; an art class; a weekly program to develop coping skills; and a music program. M.S. graduated from high school in March 2023, and he enrolled in college classes soon thereafter.

8

In recorded jail phone calls from December 2022 to early July 2023, M.S. referenced killing people, admitted to using substances while in detention, attributed his negative behavior to using Xanax, arranged for contraband substances to be delivered to him, and threatened physical harm to L.R. In April 2023 detention officers recovered a cell phone from M.S.'s room and discovered he had posted videos on social media showing him displaying gang signs.

From May to late June 2023, M.S. received positive behavioral notes from detention officers.

4.     *M.S's detention at Los Padrinos Juvenile Hall*

In July 2023 M.S. was moved to Los Padrinos Juvenile Hall after Nidorf juvenile facility was found unsuitable for housing youth offenders. M.S. attended school consistently and participated in offered services, including weekly mental health therapy. However, M.S. engaged in four physical fights between July 2023 and February 2024.

Recorded phone calls between M.S. and L.R. from this period reflected M.S. both reaffirming and questioning his gang and drug lifestyle. In late July 2023 M.S. discussed his continued access to substances in detention, stated he wanted to change his life, and shared his regret for how he had treated L.R. In August and September, however, he threatened to physically harm L.R. and her coworkers and stated, "'I'm not changing for shit.'" In October he told L.R. that he did not want to continue the same lifestyle or worry about the "'opps'" and "'homies.'" In December he shared his fear of being stuck with "'this bullshit mentality,'" stated he was "'tired of living like this,'" and expressed his desire for a "'normal life.'" But he then said, "'Never mind . . . I'm going

9

to go home and fuck the city up.'"  In January 2024, M.S. told L.R. that he regretted how he talked to her and wished he had "'learned how to treat a woman'" before their relationship.

During the 11-month period from March 2024 through January 2025, M.S. received positive behavioral notes from detention officers and had no reported instances of violent or threatening conduct, although he assisted another youth offender as part of "horseplay" in feigning a seizure in September 2024. Detention observation reports from this period noted that M.S. was "respecting staff and getting along with peers," "showing maturity and growth as a young man," "possess[ing] leadership and respect," sharing future plans of success, "practice[ing] conflict resolution by communicating without getting upset," and "counsel[ing] his peers and encourag[ing] them to run a productive program."  M.S. continued to attend college courses, weekly mental health services, and weekly community-based programming.  However, as we will discuss, from April to November 2024 M.S. posted live stream videos and made other posts to his social media account that suggested he had developed an association with the Playboys criminal street gang.

5.     *The prosecution's gang evidence*

Javier Avila, a Bell Police Department investigator assigned to a gang task force covering the City of Maywood, testified as the People's gang expert.  Avila first met M.S. in 2018 when police contacted a group of individuals who were tagging monikers associated with the Dia Trece criminal street gang. M.S., then 14 years old, was with the individuals when they were detained.  Avila opined that prior to Brandon's murder in May 2021, M.S. was a member of the Dia Trece gang.  Avila

10

based his opinion on M.S.'s frequent association with Dia Trece gang members, his tagging, and his social media post prior to the shooting in which he said, "'On my Diablos set.'"  Avila testified this statement showed M.S.'s allegiance to the Dia Trece gang.

While in detention, M.S. posted videos and messages that referred to and displayed hand gestures associated with the Playboys gang (and not the Dia Trece gang), suggesting that M.S. had become associated with the Playboys gang.  However, Avila did not have sufficient information on which to opine whether M.S. had become a member of the Playboys gang.  Avila clarified that a person who is "associated with" a gang means the person has "hung out with them," but becoming a gang member means the person has claimed allegiance to the gang.

In April 2024 M.S. posted a live stream video of himself in the detention setting making hand gestures resembling a Playboy bunny symbol commonly used by the Playboys gang.[3]  In another video M.S. referred to the "56 hood" and made hand gestures that looked like the numbers "5" and "6," and he later posted the number "6" and "da6."  Avila testified the Playboys gang's 56th Street clique used the numbers "5" and "6" as identifying symbols.  In August, detention officers found papers in M.S.'s room with writing containing the words "Looney," which was M.S.'s moniker, "Looney Tunez," "Looneyoffda6," and the numbers "5" and "6."  In late November investigators discovered M.S. had "liked" a social media post by an individual whose moniker was associated with the Playboys gang.

---

[3]     M.S. had access to a contraband cell phone while in juvenile hall on which he filmed the live stream videos and made social media posts.

6.      *Other prosecution evidence*

Los Angeles County Supervising Deputy Probation Officer Kurtis Miller testified about the services and programming that would be available for M.S. at the Barry J. Nidorf SYTF if he were adjudicated a ward of the court by the juvenile court.  Miller was assigned to the facility in July 2023, after the prior Nidorf juvenile hall facility closed, and the facility reopened as an SYTF facility (with new rehabilitative treatment programs.  Under the SYTF system, within 30 days of a youth offender's arrival, the facility would coordinate with DMH and Los Angeles County Office of Education to provide the offender an individualized rehabilitation plan that would identify appropriate treatment, including for mental health and substance abuse issues.  Youth offenders would be assigned a caseworker, who would conduct weekly sessions with the offender to track behavior and ensure compliance with the treatment program.

Miller explained the programming at Nidorf SYTF was "more robust" than at Los Padrinos.  DMH provided group and individual sessions with licensed clinicians, including substance abuse therapy, and a separate substance abuse treatment program was onsite seven days a week.  Youth offenders could also participate in college courses; peer mentorship; and art, sports, music, and workforce development programs.  Further, the SYTF had gang intervention programs to help youth with gang affiliations, and it housed those youths in units without gang conflicts.  Miller acknowledged that the programming at Nidorf SYTF had only begun in July 2023, and therefore, there was "no conclusive evidence yet about [the programs'] impact on recidivism on youthful offenders."  However, Miller opined that in most cases, youth offenders who were previously housed at Los

12

Padrinos and came to the Nidorf SYTF after disposition have "a shift in [their] behavior."

Clinical psychologist Blake Carmichael, Ph.D., testified and submitted an expert report.[4] Dr. Carmichael opined that M.S. may not be suitable for juvenile jurisdiction with respect to four of the five statutory criteria under section 707. As to the second criterion whether M.S. could be rehabilitated prior to expiration of the juvenile court's jurisdiction (within three-and-a-half years), Dr. Carmichael expressed a "significant concern about the juvenile court's ability to address [M.S.'s] immediate needs and the limited time available to oversee a reintegration into community and occupational life." Dr. Carmichael concluded "juvenile jurisdiction *may not* be suitable under this provision of WIC 707." (Boldface omitted, italics added.) He explained there were heightened risk factors, including M.S.'s family functioning, community influences, personal attributes (including aggression), continued affiliation with a gang, and his behavior while in

---

[4] We grant M.S.'s motion to augment the record to include the reports of Dr. David Contreras, Dr. Blake Carmichael, and Regina Robles, which were submitted to the juvenile court; M.S.'s written objections to curtailment of cross-examination filed on December 5, 2024; and the court's August 11, 2025 minute order denying M.S.'s motion for rehearing. (Cal. Rules of Court, rules 8.407, subd. (a)(3), (4) & (12).) We also grant M.S.'s request to take judicial notice of the Assembly Committee of Public Safety's analysis of Assembly Bill No. 2361 (2021-2022 Reg. Sess.), as amended March 31, 2022. However, we deny M.S.'s request to take judicial notice of letters of support filed on M.S.'s behalf after the transfer hearing. (*Adams v. Bank of America, N.A.* (2020) 51 Cal.App.5th 666, 674 ["'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court.'"].)

13

detention.  M.S. had "made some improvements" and exhibited the capacity to grow and mature, but even while he was receiving increased programming in the middle of 2023, he "vacillated" with respect to his ability to avoid aggression and substance abuse.  Dr. Carmichael noted M.S.'s vacillation on phone calls with L.R. in which he sometimes said he would "'get better'" and get a job when he gets out, and other times said he was going back to "'the streets.'"

Dr. Carmichael described the services generally offered at SYTF facilities (based on a July 2022 brochure), including behavioral therapy, crisis intervention, psychiatric medication services, and substance abuse programming, in addition to comprehensive education services, life skills, mentorship, and community reentry.  According to Dr. Carmichael, the SYTF programming was patterned on services previously provided by the DJJ, and in the absence of research and statistics showing outcomes from programming at a SYTF, he was relying on data from DJJ, which showed high re-arrest and recidivism rates.  Specifically, published data showed that 75 percent of young adults who participated in DJJ programming were arrested within three years of their release for new crimes, and nearly 30 percent were returned to state custody for felonies.  By contrast, the California Department of Corrections and Rehabilitation (CDCR) provided specialized rehabilitation services for youth offenders that would provide a longer period of oversight for transition back into the community.

Based on these factors, Dr. Carmichael opined that M.S. "may not be appropriate for juvenile justice" during the time he had remaining under juvenile court jurisdiction.  He clarified that it was "possible" M.S. could be rehabilitated during this time

14

period, but he was "skeptical" that M.S. could sustain those gains "given the need for oversight, [and] the risk of recidivism" in three to five years. Dr. Carmichael could not provide a percentage estimate of M.S.'s chance of success and did not believe any research could confidently predict a youth offender's rehabilitation in a three-and-a-half year program.

7. *The defense witnesses*

Clinical psychologist David Contreras, Psy.D., testified and submitted an expert report for the defense. He concluded M.S.'s rehabilitative "prognosis" was "positive," meaning that he would benefit from future intervention efforts and make gains in addressing the risk factors that were relevant to his rehabilitation. Dr. Contreras noted that M.S. had not consistently received intervention prior to being detained in juvenile hall, and when he was initially detained, he showed "lots of concerning behaviors." However, once M.S. became involved in programming, he showed improvement with an upward trajectory and a "more positive arc of engagement" during the last year. Dr. Contreras acknowledged there were recent "detours into problematic behaviors" from that trajectory, including M.S. possessing contraband (the cell phone) and posting videos on social media. But Dr. Contreras opined that M.S.'s "improvement" in responding to feedback had "positive implications for his engagement going forward," and M.S. was "beginning to develop insight into [his] problematic thinking patterns."

Dr. Contreras explained that as a psychologist, he could not make long-term predictions whether an individual would reoffend because young adults are rapidly changing, noting he did not

15

have a "crystal ball." Instead, his role was to provide an opinion on whether the prognosis for an offender is good (or not) going forward. Dr. Contreras noted M.S.'s behavior and engagement in treatment had "peaks and valleys," but M.S. was engaging "more consistently now over time." M.S.'s prognosis for his remaining three-and-a-half years in juvenile custody was "good" because he was 21 years old and at a point where he had the potential to mature and grow within his remaining treatment time, and his recent progress showed that "change [wa]s under way." Further, in contrast to the "limited complement of services" that were available to M.S. in juvenile hall, which principally served as a detention center, the SYTF would offer a multidisciplinary team of social workers, a psychologist, mental health staff, and technicians, and it would offer M.S. an individualized intervention program that would address his risk factors and clinical needs, provide behavioral therapy, offer supplemental services like peer mentoring, and monitor his treatment progress.

Social worker Regina Robles testified and submitted an expert report concluding M.S. could be rehabilitated prior to the expiration of the juvenile court's jurisdiction. M.S. and his father had maintained a peer rather than a parent-child relationship, and M.S.'s mental health had deteriorated after his father allowed him to stop taking his prescribed medications, leading to increased behavioral issues. M.S. never had his psychological, substance abuse, or mental health issues appropriately addressed before he was detained. Further, M.S. was not receiving the intensive mental health and substance abuse services he needed at Los Padrinos. Nonetheless, M.S. had demonstrated his commitment to rehabilitation over the past year by graduating high school, enrolling in college, seeking drug counseling,

16

engaging in mental health counseling, and remaining open to additional services.

Susy Rios testified as a registered drug counselor for the Los Angeles Centers for Alcohol and Drug Abuse program (L.A. CADA), a program at Los Padrinos that provided early intervention, prevention, and outpatient referrals for substance abuse. She first assessed M.S. in October 2023, at which time she wanted to refer M.S. to outpatient treatment, but she was unable to do so because M.S. was housed in a high security unit. Instead, Rios enrolled M.S. in early intervention programming, which she described as "an educational, lowest level of care" addressing topics like "the effects of drugs and alcohol, [and] coping skills." M.S. attended 16 group and individual sessions over the course of a year, during which Rios observed that M.S. was actively engaged in the sessions and grew more open about his substance abuse history and what triggered his use. M.S. needed outpatient substance abuse services, and if he were housed at SYTF, Robles could refer him to receive the services.

Caeser Galvez testified as a mentor in the ARC program at Los Padrinos, which provides rehabilitation and wraparound services for individuals who were previously incarcerated. Galvez had known M.S. for 14 months, worked with him every day, mentored him individually two days a week, and discussed gang membership and drug use as part of M.S.'s individual sessions. Galvez stated M.S. was "taking his rehabilitation and recovery seriously," had gone "above and beyond" with programming, and was "easily [in the] top five" of the 200 offenders with whom Galvez had worked at Los Padrinos. The ARC program at SYTF had a larger number of mentors serving a smaller population.

17

A director for an athletic and life skills program and two detention officers from Los Padrinos also testified regarding M.S.'s personal growth, mature and respectful behavior, positive influence on other offenders, and active engagement in programming.

D.     *The Juvenile Court's Ruling*

On February 28, 2025, after hearing argument of counsel, the juvenile court granted the prosecution's motion to transfer. The court noted it had reviewed all the testimony, evidence, transcripts, expert reports, and pleadings, and it explained that it viewed its analysis through the "overarching lens . . . of amenability," taking into account "the arch of the minor's behavior and . . . the totality of the circumstances." The court provided its ruling on each of section 707's five criteria, finding the prosecution had met its burden by clear and convincing evidence on three of the five criteria. (See § 707, subd. (a)(3)(A)-(E).)

The juvenile court found, as to the first factor, that M.S.'s degree of criminal sophistication weighed in favor of transfer. The court concluded that M.S. planned and prepared to kill Brandon. M.S. and Brandon had a prior history of conflict, and M.S. intended to kill his perceived rival by attending L.R.'s party and "manufactur[ing] [a] confrontation" with Brandon. The killing was not "spur-of-the-moment," given that M.S. pursued Brandon even after he was physically restrained by the party attendees. Although there was some evidence that M.S. was under the influence of Xanax on the night of the offense, he posted on social media shortly after the murder that he had to "'get high and kill that shit,'" and the court was "taking the minor

18

at his word." Further, after the shooting M.S. bragged about the killing in his live stream video posted on social media, suggesting his motive for killing Brandon was to establish a "dominant position" over him. Although some of M.S.'s post-arrest behavior "showed some insight, showed some compassion, . . . for the most part, it's negative."

The juvenile court found the second criterion (whether M.S. could be rehabilitated prior to expiration of the court's jurisdiction) weighed in favor of transfer. The court stated it relied heavily on the analysis and testimony of Dr. Carmichael and Dr. Contreras.. The court noted he had "great respect" for Dr. Contreras, and the doctor provided a positive prognosis with respect to M.S.'s rehabilitation. However, Dr. Contreras was unable to give a time frame for how long it would take for M.S. to be rehabilitated, which was "exactly what [the court] wanted him to do." Further, Dr. Contreras's opinion was based in part on the positive reports from the detention officers, but the court was "in profound disagreement" with Dr. Contreras's view that the officers had no incentive to give M.S. a positive reference. Rather, the detention officers were motivated by their desire "to have a good shift."

The juvenile court instead agreed with Dr. Carmichael's conclusion that M.S. "may not be suitable" for rehabilitation within the time frame, given the "lack of evidence of outcomes and effectiveness of the SYTF programming." Instead, the court relied on Dr. Carmichael's assessment that the most reliable data on the effectiveness of the SYTF rehabilitation program was the "data from [the] former DJJ regarding outcomes and recidivism," which reflected the lack of "specialized rehabilitation services" for youth offenders. By contrast, "those services are available

19

through the youthful offender program through [CDCR]," which program was "designed specifically to address youth who are under a certain age who have these issues." In addition, the CDCR program was long-term and evidence-based. On this basis the court concluded the second criterion "leans toward transfer."

The juvenile court found the third and fourth statutory criteria (M.S.'s previous delinquent history and the success of previous attempts to rehabilitate him) were neutral. The court found the previous attempts by the court to rehabilitate M.S. were "exactly appropriate" in not detaining M.S., and instead providing counseling and community service. As to the fifth statutory criterion, the court found the circumstances and gravity of M.S.'s offense weighed in favor of transfer. The court described the offense as a "cold, callous, brutal" crime in which Brandon "essentially . . . was executed." In addition, the offense was not "an act of impulsiveness" involving a threat of danger or immediate harm. Further, evidence of M.S.'s gang involvement weighed in favor of transfer.

The juvenile court held the prosecution met its burden by clear and convincing evidence that M.S. was "not a fit and proper subject for juvenile court" and he should be transferred to a court of criminal jurisdiction. The juvenile court granted the motion and ordered M.S. to adult court for arraignment.

M.S. timely appealed.

**DISCUSSION**

A. *Governing Law and Standard of Review*

Under section 707, subdivision (a)(1), when a minor 16 years or older is alleged to have committed a felony, the prosecution "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction."  The prosecution bears the burden of proving by clear and convincing evidence that the minor "is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (*Id.*, subd. (a)(3); see *In re J.S.* (2024) 105 Cal.App.5th 205, 211 & fn. 2 (*J.S.*); *In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*); Cal. Rules of Court, rule 5.770(a).)  The clear and convincing evidence standard "demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt"; "'[w]here clear and convincing proof is required, the proponent must convince the jury or judge . . . that it is *highly probable* that the facts which he asserts are true.'"  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.)

Section 707, subdivision (a)(3), provides that a juvenile court "shall consider" five statutory criteria in deciding whether a minor is not amenable to rehabilitation under the court's jurisdiction:  (1) "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) "[t]he circumstances and gravity

21

of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).  For each of these five criteria, section 707 provides a nonexhaustive mandatory list of factors to which a juvenile court "shall give weight" in evaluating the criterion.  (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

"[T]he ultimate determination of whether 'the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' (§ 707(a)(3)) is not the same as the second criterion, which calls for consideration of '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (§ 707(a)(3)(B)(i))."  (*Miguel R., supra*, 100 Cal.App.5th at p. 166; accord, *In re O.F.* (2026) 119 Cal.App.5th 133, 159.)  Under the second factor, the court must focus on "whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction."  (*Miguel R.*, at p. 166.)  But the court's ultimate finding of amenability under section 707, subdivision (a)(3), "concerns a global assessment of the minor's suitability to rehabilitation," as part of which the court must "consider not only time but also other reasons why the minor might or might not be responsive to the available rehabilitative services."  (*Miguel R.*, at p. 167; see *In re O.F.*, at pp. 158-159; *In re S.S.* (2023) 89 Cal.App.5th 1277, 1288 [juvenile court's "analysis of the five criteria set forth in the statute should be focused through the lens of amenability to rehabilitation"].)

"If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's

22

finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707, subd. (a)(3).)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion.  [Citation.]  'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review.'" (*Miguel R., supra*, 100 Cal.App.5th at p. 165; accord, *In re O.F., supra*, 119 Cal.App.5th at p. 160.)  "The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence.  [Citation.]  In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, at p. 165; accord, *In re O.F.*, at p. 160; see *People v. Cardenas* (2020) 53 Cal.App.5th 102, 119.)  The juvenile court's ultimate finding that a minor is not amenable to rehabilitation while under its jurisdiction is likewise reviewed for substantial evidence. (*Miguel R.*, at p. 165.)

Because the juvenile court must make these findings by clear and convincing evidence, we review its findings by "determin[ing] whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by" the clear and convincing evidence standard.  (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005; see *In re O.F., supra*, 119 Cal.App.5th at pp. 161-162; *Miguel R., supra*, 100 Cal.App.5th at p. 165.)  "The [juvenile] court's . . . conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*Miguel R.,* at p. 165; accord, *J.S., supra*, 105 Cal.App.5th at p. 211.)

B. *Substantial Evidence Supports Four of the Five Criteria Under Section 707, Subdivision (a)(3); We Remand for Reconsideration of the Second Criterion*

M.S. contends substantial evidence does not support the juvenile court's ultimate finding M.S. was not amenable to rehabilitation. He further argues substantial evidence does not support the court's findings on section 707, subdivision (a)(3)'s five criteria; the court considered improper factors; and it failed to consider required factors. We agree with M.S. with respect to the second criterion (which we discuss last). On this basis, we reverse.

1. *Criterion 1: degree of criminal sophistication*

"The criminal-sophistication criterion 'requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime.'" (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 192, quoting *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 683-684.) In considering this criterion, section 707, subdivision (a)(3)(A)(ii), requires the juvenile court to "give weight to any relevant factor, including but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human

24

trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication."

As the juvenile court observed, it was a reasonable inference that M.S. killed Brandon in retaliation for their previous confrontation in which Brandon accused M.S. of robbing him, as a result of which M.S. was charged with robbery and assault. The evidence also showed M.S. planned the shooting in advance of L.R.'s party. In February 2021 M.S. sent a text message stating he needed a gun and was "go[ing] to war," and in the days leading up to the shooting, M.S. made multiple social media posts suggesting he would shoot somebody ("'smoke[] some1'") at the party. At the party, M.S. confronted Brandon by calling him a snitch, returned to the party after being told to leave, and continued pursuing Brandon after other attendees tried to physically restrain him. M.S. also appeared to understand the consequences of his actions because he fled the scene and boasted about the killing on social media, posting a photo of a handgun with the caption "'Fuck a snitch.'" Further, there was no evidence that M.S. was pressured to kill Brandon or acted spontaneously. Accordingly, substantial evidence supported the court's finding that M.S.'s criminal sophistication weighed in favor of transfer. (See *J.S., supra,* 105 Cal.App.5th at p. 214 [affirming finding of criminal sophistication where "[t]he crimes were not spontaneous or impulsive but were indicative of deliberation"]; see also *People v. Superior Court (Jones), supra*, 18 Cal.4th at p. 684 [planning to obtain items used for the crime and selecting a vulnerable target "involved a degree of criminal sophistication precluding a finding of fitness"].)

M.S. contends the juvenile court abused its discretion in failing to consider relevant factors under section 707,

subdivision (a)(3)(A)(ii), other than the crime, including M.S.'s family environment and childhood trauma, his physical, emotional, and mental health, intellectual capacity, maturity, impetuosity, and history of substance abuse. However, the court acknowledged these factors on the record before addressing this criterion, and the court stated it had considered the testimony, evidence, transcripts, expert reports, and pleadings. As discussed, these materials included extensive evidence of each of the relevant factors. And with respect to substance abuse, the court took M.S. "at his word" that he was under the influence of Xanax at the time he committed the offense.

"Absent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390; see *J.S., supra*, 105 Cal.App.5th at p. 214 [rejecting argument that juvenile court failed to consider all factors relating to criminal sophistication because the court expressly stated it had considered the arguments, reports, exhibits, and witness testimony, "which necessarily included evidence of appellant's social, emotional, and intellectual history"].) Notwithstanding the significant evidence of M.S.'s childhood trauma, long-term substance abuse, mental health diagnoses, limited cognitive functioning, lack of maturity, and impulsiveness, substantial evidence supports the finding that M.S. exhibited a degree of criminal sophistication with respect to his planning, committing, and boasting about the killing that favored transfer.[5]

---

[5] M.S. also contends the juvenile court abused its discretion with respect to the first criterion in excluding a ballistics laboratory report stating that two additional cartridges fired from a second firearm were found at the murder scene; M.S. argues

26

2.    *Criteria 4 and 5: success of previous rehabilitation attempts circumstances and gravity of the offense*[6]

M.S. argues with respect to the fourth criterion under section 707, subdivision (a)(3)(D)) (success of previous rehabilitation attempts), which factor the court found was neutral, that the juvenile court abused its discretion in focusing only on the effect of the juvenile courts' rehabilitation services provided prior to the current detention, and not on M.S.'s success in responding to the rehabilitation services offered while M.S. was detained in the DJJ system.  It is true that the court in its ruling focused on M.S.'s response to services provided prior to his current detention.  However, the court stated it considered all the evidence in the record, which included evidence of M.S.'s extensive participation in rehabilitation programs available in the DJJ system.  On remand, in evaluating this factor, the court should consider M.S.'s response to rehabilitation services offered both before and after his current detention.

M.S. argues with respect to the fifth criterion under section 707, subdivision (a)(3)(E)) (the circumstances and gravity of the offense), as he did with respect to the first criterion, that the juvenile court failed to consider evidence regarding the

---

this evidence showed he shot in self-defense, thereby mitigating the severity of the offense.  The court did not abuse its discretion in excluding the evidence because "the gravity criterion focuses on the offense "*alleged in the petition*"' [citation], and like the other statutory criteria, it is 'based on the premise that the minor did, in fact, commit the offense.'" (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189.)

[6]    M.S. does not contend on appeal that the juvenile court abused its discretion with respect to the third criterion (previous delinquency history), which the court found was neutral.

27

relevant factors, including his mental and emotional development. The juvenile court heard ample evidence regarding these factors, and we presume the court considered this evidence in making its finding on this criterion. M.S. also contends the court gave too much weight to M.S.'s "gang lifestyle" and continued affiliation with a gang while in detention, pointing out that the defense gang expert stated that as of December 2024 M.S. was no longer associated with a gang. However, the court credited the testimony of the prosecution's gang expert that M.S. was associated with the Playboys gang, and the court considered the evidence that in 2024 M.S. was posting videos of him making gang signs and using numbers associated with the Playboys gang. We review the court's finding for substantial evidence, not whether the evidence would have supported a different finding. (See *In re O.F., supra*, 119 Cal.App.5th at p. 160; *Miguel R., supra*, 100 Cal.App.5th at p. 169.)

> 3. *Criterion 2: rehabilitation prior to the expiration of the juvenile court's jurisdiction*

In evaluating whether a minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the court "shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).) "[T]he focus of the second criterion is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R., supra*, 100 Cal.App.5th at p. 166; accord, *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 721.) It is undisputed that at the time of the court's transfer ruling, M.S. had approximately three-and-a-half years remaining under the court's jurisdiction.

28

M.S. contends the juvenile court erred in relying on DJJ recidivism data to conclude (based on Dr. Carmichael's opinion) that M.S. may not be rehabilitated within the remaining time period, in the absence of evidence of the effectiveness of SYTF programming or the outcomes for juvenile offenders. We agree. The court's reliance on data from the failed DJJ system to predict outcomes at the SYTF facility is at odds with the Legislature's stated intent in enacting "[j]uvenile justice realignment" and establishing the SYTF system to replace the DJJ system, that counties "use evidence-based and promising practices and programs that improve the outcomes of youth and public safety, reduce the transfer of youth in to the adult criminal justice system, ensure that dispositions are in the least restrictive appropriate environment, . . . , and reduce the use of confinement in the juvenile justice system by utilizing community-based responses and interventions." (Sen. Bill 823.) (Stats. 2020, ch. 337, § 1(e).) Realignment was also intended, as part of the goal to rehabilitate youth offenders, "to ensure that justice-involved youth are closer to their families and communities and receive age-appropriate treatment," and "to establish a separate dispositional track for higher-need youth." (*Id.*, Stats. 2020, ch. 337, §§ 1(b), 30(e); see *In re Jose R.* (2024) 102 Cal.App.5th 839, 845.)[7]

---

[7] Prior to 2020, commitment to the DJJ served as "the state's most restrictive placement for its most severe juvenile offenders." (*In re Miguel C.* (2021) 69 Cal.App.5th at p. 902; see *In re Jose R., supra*, 102 Cal.App.5th at p. 845.) To effectuate the transfer of youth offenders to the newly realigned SYTF system, in 2021 the Legislature enacted section 875, which provided that youth offenders who would have previously been committed to the DJJ would instead be committed to an SYTF. (Senate Bill No. 92

Moreover, effective January 1, 2023, the Legislature amended section 707 with Assembly Bill No. 2361 (2021-2022 Reg. Sess.), which (1) raised the standard of proof for a youth offender's transfer to adult court to clear and convincing evidence, and (2) required any juvenile court ordering transfer to state its reasons supporting its finding that the youth offender is not amenable to rehabilitation while under its jurisdiction. (*In re O.F., supra*, 119 Cal.App.5th at pp. 159-160; *Miguel R., supra*, 100 Cal.App.5th at p. 164.) These changes were made in part to "ensure[] that youth amenable to treatment and rehabilitation will be retained in juvenile court," "reduce[] arbitrary transfer determinations that are not supported by clear and convincing evidence," and "ensure that . . . youth transfers to adult criminal court are reduced in the wake of DJJ's closure." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) Apr. 5, 2022, pp. 8-9.)

These legislative changes demonstrate a clear intent to rehabilitate youth offenders in a new less restrictive setting (the SYTF's) in which age-appropriate community-based treatment would provide greater rehabilitation than the former DJJ system and reduce the number of youth offenders who are transferred to the adult criminal justice system. But the juvenile court's approach in this case, by relying on data showing the likelihood that youth offenders housed at DJJ would reoffend, did the

(2021-2022 Reg. Sess.) (Stats. 2021, ch. 18, § 12); see *In re Jose R.*, at p. 845.) Under realignment, DJJ's responsibilities were transferred to California's counties beginning on July 1, 2021 (§ 736.5, subd. (a)), and DJJ was closed on June 30, 2023 (*id.*, subd. (e)). (See *In re M.B.* (2024) 99 Cal.App.5th 435, 448.)

30

opposite—it denied M.S. the opportunity to receive the more robust programming at SYTF on the assumption the facility would provide the same services the former DJJ facilities provided.

The juvenile court compounded this error by relying on Dr. Carmichael's opinion that M.S. was more likely to be rehabilitated in the youth offender program at CDCR, which would provide long-term "evidence-based" treatment. The question before the court under section 707, subdivision (a)(3)(B)(i), was not whether M.S. could be rehabilitated in the adult criminal justice system, but whether he could be rehabilitated in the juvenile justice system prior to expiration of its jurisdiction. (See § 707, subd. (a)(3)(B)(i).)

We recognize that at the time of the February 2025 transfer hearing, the SYTF facility had been in operation for less than two years, and thus there was no data on the extent to which the SYTF system would succeed in its long-term rehabilitation goals. But there was evidence of the more comprehensive rehabilitation services that would be available to M.S. As Miller testified based on his year and a half working at the Nidorf SYTF, M.S. would have access to "more robust" rehabilitation services at the SYTF than he had received at Los Padrinos juvenile hall, including an individualized rehabilitation plan, weekly sessions with a case worker to ensure compliance, mental health treatment, onsite daily substance abuse treatment, and gang intervention resources, in addition to college courses, workforce development programs, and other enrichment programs. By contrast, for example, as both Robles and Rios testified, at Los Padrinos M.S. had not received substance abuse treatment, instead having access only to an educational program on the effects of drug and

31

alcohol use and coping skills.  In addition, Miller had observed a change in the behavior of youth offenders transferred from Los Padrinos to the SYTF.

The juvenile court's error in relying on the DJJ data and the CDCR youth offender program was significant given its prominence in the court's conclusion that the second criterion "leans" toward transfer.  The evidence supporting this factor was not otherwise strong.  Dr. Carmichael opined M.S. had the capacity to grow and mature, and he acknowledged it was "possible" M.S. could be rehabilitated during the remaining time period.  Dr. Carmichael concluded it was "unlikely" M.S. could be rehabilitated in the time remaining, based in part on the inability of the juvenile facility to provide the necessary oversight for his rehabilitation.  Yet the SYTF would provide more intensive rehabilitation and oversight.  And, as discussed, both Dr. Contreras and Robles opined M.S.'s prognosis for rehabilitation was positive.

In addition, M.S. demonstrated significant progress in Los Padrinos within the year preceding his transfer hearing, with no further aggressive or violent conduct.  It is true, as the juvenile court observed, that M.S. continued to associate with the Playboys gang in 2023 and 2024.  But the court did not rely on this as a central factor in its ruling.  Further, in his phone calls with L.R., M.S. vacillated as to whether he wanted to continue the gang lifestyle.  And, as discussed, the SYTF would provide gang intervention resources and ensure that M.S. was housed in a unit where he would not be exposed to gang conflicts.

M.S. urges us to reverse the juvenile court's transfer decision and to order the court to hold a jurisdictional hearing. In light of the court's erroneous reliance on the DJJ data and

CDCR youth offender program, we agree that reversal is required with respect to section 707's second criterion.  However, it is the court's role in the first instance to weigh section 707's five statutory criteria.  (See *Kevin P. v. Superior Court, supra*, 57 Cal.App.5th at p. 201 ["nothing in section 707 supports the notion that the rehabilitation criterion is . . . determinative regardless of the other criteria that must be considered"].)  We therefore reverse the order transferring M.S. to the criminal court and remand for the juvenile court to reconsider its finding on the second statutory criterion consistent with this opinion and to make a new finding, after consideration of all five criteria under section 707, subdivision (a)(3), whether the People have shown by clear and convincing evidence that M.S. is not amenable to rehabilitation while under the jurisdiction of the juvenile court.  In making this determination, the court shall consider any evidence submitted by the parties relating to M.S.'s rehabilitation since the February 2025 transfer hearing.

## DISPOSITION

The juvenile court's order transferring M.S. to a court of criminal jurisdiction is reversed.  We remand for the juvenile court to reconsider the second criterion under section 707, subdivision (a)(3)(B), consistent with this opinion, whether M.S. can be rehabilitated prior to the expiration of the court's jurisdiction.  In addition, the court is to make a finding whether, in light of all five statutory criteria, the People have met their burden of demonstrating by clear and convincing evidence that M.S. is not amenable to rehabilitation (§ 707, subd. (a)(3)).  On remand, the court shall consider any evidence submitted by the

parties relating to M.S.'s rehabilitation since the February 2025 hearing on the transfer motion.



FEUER, J.

We concur:


MARTINEZ, P. J.


SEGAL, J.